**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SEDERIS FIELDS,

        *Plaintiff*,

    v.

THOMAS J. VILSACK, Secretary, U.S.
Department of Agriculture,

        *Defendant*.

Civil Action No. 13-2037 (RDM)

**MEMORANDUM OPINION AND ORDER**

Plaintiff Sederis Fields is a longtime employee of the United States Department of

Agriculture ("USDA"). Her relationship with her supervisor, John Chott, has been fraught with

disagreement for more than a decade. She has unsuccessfully sued the USDA before, and Chott

was a key witness in that case. While that case was still pending, Fields suffered a series of

alleged workplace indignities, all of which involve Chott in one form or another. She has now

brought suit alleging that these incidents were the product of illegal discrimination based on her

sex and race, and the product of illegal retaliation based on her previous complaints. The USDA

has moved to dismiss or, in the alternative, for summary judgment. *See* Dkt. 26. For the reasons

explained below, the Court will grant that motion in part and will deny it in part. Fields has also

filed a separate motion asserting that she requires discovery before the Court considers whether

to grant summary judgment to the USDA on any issues. For the reasons explained below, that

motion is granted.

# I.  BACKGROUND

For purposes of the USDA's motion to dismiss, the following allegations from Fields's complaint are taken as true.  *See, e.g.*, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## A.      Fields's History with the U.S. Department of Agriculture

Fields is an African American woman who had worked at the Department of Agriculture for close to thirty years.  *See* Compl. ¶ 2.  Since 1997, she has worked at the GS-13 grade level, serving for the majority of that time as a "Program Coordination Specialist" under the Deputy Administrator for Field Operations ("DAFO office") within the Farm Service Agency.  *Id.* ¶ 10. In 2003, Fields filed an administrative Equal Employment Opportunity ("EEO") complaint against the USDA and then, in 2006, filed a lawsuit on those same charges in federal district court.  *Id.* ¶¶ 13–14.  That lawsuit dragged on for years.  After a five-day trial, the jury was unable to reach a unanimous verdict, and Judge Kennedy declared a mistrial in 2009.  Mem. Op., *Fields v. Johanns*, No. 06-cv-0538 (D.D.C. July 19, 2011), ECF No. 80 at 3.  In 2011, Judge Kennedy granted judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 56, in favor of the USDA.  *Id.* at 15.  Subsequently, then-Chief Judge Lamberth, to whom the case was transferred upon Judge Kennedy's retirement, denied Fields's *pro se* motion for reconsideration. Mem. Op., *Fields v. Johanns*, No. 06-cv-0538 (D.D.C. Jan. 30, 2012), ECF No. 87.  That lawsuit is not directly at issue here, but it sets the stage for Fields's present allegations of retaliation because, among other things, Fields's longtime supervisor, John Chott, was "accused of discrimination," was "a trial witness," and was "an active participant in USDA's defense" in the earlier case.  Compl. ¶ 19.

**B.      Fields's Conflicts With Her Supervisor Over Performance Ratings and Performance Plans**

The facts that led to the present case began in June 2009, when Fields left the DAFO office for a twenty-month detail at the USDA's Civil Rights Task Force ("Task Force").  Compl. ¶ 22.  In October 2009, after Fields had been on the detail for roughly four months, her supervisor on the Task Force, Melvin Womack, gave her an "Outstanding" performance rating for fiscal year 2009.  *Id.* ¶ 23.  Fields allegedly learned on March 31, 2010, however, that Chott had "downgraded" that rating to "Superior" for fiscal year 2009.  *Id.* ¶ 24.  According to the complaint, Chott lacked the authority to lower her performance rating.  *Id.* ¶¶ 26–28.

Fields and Chott met in Chott's office on March 31, 2010, to discuss the lower performance rating.  *Id*. ¶ 36.  During this meeting, Chott allegedly "tried to coerce Ms. Fields into signing his 2010 performance plan" for her, even though Fields remained on detail in a different office and had signed a performance plan for her detail assignment.  *Id.* ¶¶ 41–42.  Fields refused to sign Chott's proposed plan.  *Id.* ¶¶ 43–46.  After the meeting, Chott allegedly "slammed his door so hard that it shook the walls of the office," caused a colleague to ask whether she should call security, and prompted Chott's supervisor to emerge from his own office and ask what happened.  *Id.* ¶¶ 36–38.  The complaint does not assert that anyone actually called for outside intervention, but it does allege that Fields was "intimidated, frightened, and upset." *Id.* ¶ 39.  Fields contacted the USDA's EEO office about her lowered performance rating that same day—March 31, 2010—and she filed a formal EEO complaint a month later on April 30, 2010.  *Id.*¶ 8.

**C.      Fields Does Not Receive a Promotion Upon Her Return**

Fields completed her detail and returned to her previous position with the Deputy Administrator for Field Operations, under Chott's supervision, on February 14, 2011.  Compl.

3

¶ 49.  Just a few weeks later, on March 2, 2011, Fields and her colleagues received an email from Chott announcing that Barbara Boyd, a white woman, would be reassigned to his staff on March 14, 2011.  *Id.* ¶ 50.  Chott then sent a follow-up email on March 10, 2011, announcing that Ken Nagel, a GS-14, would retire at the end of the month.  *Id.* ¶ 51.  During the few weeks between the time Boyd rejoined Chott's staff on March 14, 2011 and Nagel's retirement on March 31, 2011, Boyd worked at a conference table in Nagel's office.  *Id.* ¶¶ 51–52.  After Nagel retired, Boyd assumed "sole possession of" his office, and, more importantly, took over his job.  *Id.* ¶¶ 52–55.

This development touched an old wound for Fields.  Nagel's position was a GS-14 and thus would have represented a promotion from Fields's GS-13 position.  It was also the very same position that Fields had unsuccessfully applied for in 2003, which precipitated the earlier litigation.  *Id.* ¶ 54.  Making matters worse, according to Fields, was the fact that Chott filled the position through a non-competitive assignment.  The position was never advertised, and Fields was never provided an opportunity to compete for the job that she had sought since at least 2003. *Id.* ¶¶ 53–55.  In her view, Chott took the unusual step of filing the position laterally—without a competitive process—in order to favor a white employee and to retaliate against Fields for her prior EEO activity and lawsuit.  *Id.* ¶¶ 55–56.  Fields contacted the USDA's EEO office on March 28, 2011, to complain that Chott's failure to promote her to Nagel's position was both discriminatory and retaliatory, and she subsequently filed a formal EEO complaint.  *Id.* ¶ 9.

**D.    Procedural History**

Fields filed the present suit on December 20, 2013, alleging that the USDA retaliated against her for engaging in protected EEO activity (Count 1), and discriminated against her on the basis of her sex (Count 2) and race (Count 3), all in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").  *See* Compl. ¶¶ 57–59.  In support of Count

1, Fields alleges that Chott lowered her performance rating from "Outstanding" to "Superior,"

subjected her to a hostile work environment and unequal terms and conditions of employment,

and denied her the opportunity to compete for a GS-14 position in retaliation for EEO activity.

For the most part, Fields relies on the same allegedly wrongful conduct in support of Count 2;

the one exception is that she does not rely on Chott's alleged denial of her right to compete for

the GS-14 position, presumably because Boyd, who was given the job, is also a woman.  And,

finally, in support of Count 3, Fields relies on all of the same purportedly discriminatory acts

identified in Count 1.

In response, the USDA has moved to dismiss or, in the alternative, for summary

judgment.  *See* Dkt. 26.  Fields, in addition to opposing that motion, has moved for leave to take

discovery pursuant to Federal Rule of Civil Procedure 56(d).  *See* Dkt. 31.

## II.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must have 'facial plausibility,' meaning it

must 'plead[] factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.'"  *Hettinga v. United States*, 677 F.3d 471, 476

(D.C. Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "In evaluating a Rule

12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be

granted the benefit of all inferences that can be derived from the facts alleged.'"  *Id.* (quoting

*Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)).  "The [C]ourt, however, need not

accept as true a legal conclusion couched as a factual allegation, or inferences . . . unsupported

by the facts set out in the complaint."  *Ames v. Johnson*, 121 F. Supp. 3d 126, 129 (D.D.C. 2015)

(internal quotation marks and citations omitted) (second alteration in original).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Liberty Lobby*, 477 U.S. at 248). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255. To prevail at summary judgment, the non-moving party must, however, offer more than "a scintilla of evidence" in support of its position. *Id.* at 252. "[T]here must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

### III. DISCUSSION

The USDA raises a number of distinct arguments, some of which attack the legal sufficiency of Fields's complaint and some of which argue that, based on the undisputed facts, Fields's cannot prevail. Dkt. 26. Fields, in turn, responds that the complaint is legally sufficient and that, to the extent the underlying facts come into play, the USDA's motion is premature. In support of this latter point, Fields supports her opposition with a separate motion seeking discovery and, as required by Federal Rule of Civil Procedure 56(d), a declaration identifying the specific facts on which she requires discovery. *See* Dkts. 30, 31-1 & 39-2. Fields is correct that, although "the district court[s] enjoy[] 'broad discretion in structuring discovery,' summary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'" *Covertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012) (citations omitted). For this

reason, a Rule 56(d) "motion requesting time for additional discovery should be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.'" *Id.* (quoting *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995)).

The Court will, accordingly, address each of the USDA's arguments, first to determine whether Fields's allegations are legally sufficient and then, if necessary, to determine whether Fields should be permitted to conduct relevant discovery before responding to the USDA's defenses.

## A.      Exhaustion of Administrative Remedies

The USDA argues that Fields failed to file a timely administrative complaint relating to Chott's decision to lower her 2009 performance rating from "Outstanding" to "Superior."  For the reasons explained below, the Court concludes that this defense turns on a material issue of fact that cannot be resolved in the present posture.

Title VII and the governing regulations require federal employees to exhaust administrative remedies before filing suit in federal court.  *See* 42 U.S.C. § 2000e-16(c); *Washington v. Wash. Metro. Area Transit Auth.*, 160 F.3d 750, 752 (D.C. Cir. 1998).  The exhaustion requirement provides "federal agencies an opportunity to handle matters internally whenever possible" and "ensure[s] that the federal courts are burdened only when reasonably necessary."  *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985).  Failure to exhaust is an affirmative defense, and the defendant bears the burden of proof.  *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997); *see Nichols v. Vilsack*, No. 13-cv-1502, 2015 WL 9581799, at *7 (D.D.C. Dec. 30, 2015).

The EEOC has promulgated detailed regulations establishing administrative procedures for the resolution of Title VII employment discrimination claims against federal agencies. The D.C. Circuit has summarized those procedures as follows:

> Under Title VII, [federal] employees who believe they have been discriminated against must first consult an Equal Employment Opportunity (EEO) Counselor within 45 days of the alleged discriminatory acts. 29 C.F.R. § 1614.105(a)(1). Should the employee and the Counselor fail to resolve the discrimination claim within 30 days, the Counselor sends the employee a notice explaining the administrative complaint procedure. *Id.* § 1614.105(d). The employee then has 15 days to file an individual and/or class complaint with the employing agency. *Id.* § 1614.106 (regulations governing individual complaints); *id.* § 1614.204 (regulations governing class complaints); *see also id.* § 1614.103 (noting types of complaints governed by agency processing procedures outlined in regulations). Upon receipt of a final agency decision—known as a "FAD"—disposing of the administrative complaints, the employee has either 30 days to appeal to the Equal Employment Opportunity Commission (EEOC), *id.* §§ 1614.401(a), 1614.402(a), or 90 days to file suit in federal court, 42 U.S.C. § 2000e-16(c).

*In re James*, 444 F.3d 643, 644 (D.C. Cir. 2006). An employee is also authorized to file suit in federal court if 180 days have passed from the "date of filing an appeal with the" EEOC and the EEOC has failed to render a final decision. 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407.

Here, there is no dispute that Chott rated Fields as "Superior" on November 30, 2009; indeed, that same day, Fields signed her "Performance Appraisal" form, which reflected the "Superior" rating. Dkt. 26-3. And, similarly, there is no dispute that Fields did not initiate the EEO counseling process regarding her 2009 evaluation until March 31, 2010, *see* Compl. ¶ 8, far more than 45 days after Fields signed the "Performance Appraisal" form. Fields argues, however, that she nonetheless timely initiated the EEO counseling process because it was not until March 31, 2010, that she became aware that Chott's "Superior" rating, and not her detail supervisor's "Outstanding" rating, would constitute her "official rating of record" for the evaluation period. *See* Dkt. 30 at 17–18. Fields then relies on 29 C.F.R. § 1614.105(a)(2),

which extends the 45-day limit if the employee "did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred." *See* Dkt. 30 at 18.

As an initial matter, the Court concludes that the USDA cannot prevail on its exhaustion defense based solely on the pleadings. To the contrary, the complaint alleges that Fields "timely initiated EEO counseling on March 31, 2010, by contacting [the USDA's] EEO Office on the same day that she learned that [the] USDA considered an unfairly low rating by . . . John Chott to be her official rating." Compl. ¶ 8. If the USDA's motion is considered under the Rule 12(b)(6) standard, the Court must accept this allegation as true for purposes of resolving the motion. *Hettinga*, 677 F.3d at 476. And, accepting the allegation as true, and drawing all reasonable inferences in favor of Fields, *id.*, the Court concludes that it was not until March 31, 2010, that Fields knew, and reasonably should have known, that she received a "Superior" rating for the overall 2009 performance appraisal period. Thus, to the extent the USDA premises its exhaustion defense on Rule 12(b)(6), the Court will deny that motion.[1]

A similar result also follows under Rule 56. To prevail at this stage of the proceeding, Fields need show only that there exists a genuine dispute of material fact about when she became aware, and when she reasonably should have known, that she received an overall rating of "Superior" on her 2009 appraisal, *see Liberty Lobby*, 477 U.S. at 255, or else show that she should be provided the opportunity to conduct discovery on this issue, *see* Fed. R. Civ. P. 56(d). For the reasons explained below, the Court concludes that she has met this modest burden.

---

[1] The USDA also cites Rule 12(b)(1) in support its exhaustion defense. Dkt 26 at 1. But, because administrative exhaustion of Title VII remedies is not a jurisdictional requirement, *see Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 395 n.11 (1982); *Menominee Indian Tribe v. United States*, 614 F.3d 519, 527 (D.C. Cir. 2010), Rule 12(b)(1) is inapplicable.

Fields received and signed two "Performance Appraisal" forms for 2009.  As Fields

explains in her declaration, she received the first one on October 15, 2009, "four months after

[she] began [her] detail assignment."  Dkt. 39-1 at 3 (Fields Decl. ¶ 12).  That appraisal, which

was signed and delivered by Melvin Womack, Fields's supervisor during her detail, rated her

performance as "Outstanding" for the period from June 15, 2009, to September 30, 2009.  *Id.* at

3–4 (Fields Decl. ¶¶ 10, 12).  Subsequently, Fields received and signed a separate appraisal,

which was signed by Chott.  Dkt. 39-1 at 4 (Fields Decl. ¶ 14); Dkt. 26-3.  Unlike the Womack

appraisal, the Chott appraisal rated Fields's performance at the lower "Superior" level.  *Id.*

Fields stresses that the portion of this second form that was supposed to reflect the "performance

period" was left blank, and she asserts that she inferred from this omission that her earlier

"Outstanding" rating was her "rating of record."  Dkt. 39-1 at 4 (Fields Decl. ¶ 14).  Fields adds

that this "understanding was based on Agency policies and discussions with Agency human

resources representatives" and, in particular, that "Steven Crisp, a USDA human resources

specialist informed [her] that [her] 'Outstanding' rating issued by . . . Womack was [her] rating

of record for Fiscal Year 2009."  *Id.* (Fields Decl. ¶ 15).  Finally, Fields attests that it was not

until March 31, 2010, that she "learned for the first time that Chott had changed [her] Fiscal Year

2009 performance appraisal and that his 'Superior' rating was the Agency's rating of record for

the performance period," and that she initiated the EEO counseling process that very day.  *Id.* at

5 (Fields Decl. ¶ 17).

The USDA contests much of this.  It argues that the USDA Farm Service Agency

handbook provides that, if an employee works under multiple supervisors during an appraisal

period, each supervisor under whom the employee has worked for at least 90 days shall prepare

an appraisal, and all of the appraisals shall be forwarded "to the supervisor of record."  Dkt. 35 at

10

7.  That pool of appraisals is then used to develop "the employee's annual Rating of Record."  *Id.* Here, according to the USDA, Chott remained Fields's "supervisor of record," and it was thus his responsibility—with the benefit of Womack's input along with his own assessment—to generate Fields's annual rating.  To this, the USDA adds that it "would make no sense" to limit Fields's annual performance appraisal for 2009 to the three-and-a-half months that she spent on detail.  *Id.* at 8.  The USDA posits, moreover, that Fields had twenty years of experience with the USDA and was well aware of the appraisal process.  *Id.* at 9.  And, finally, the USDA notes that Fields omits from her declaration any reference to *when* Crisp allegedly told her that the "Outstanding" rating that she received from Womack would constitute her rating of record for 2009.  *Id.* at 6.

As the USDA stresses, it is odd to suggest that the views of a "detail" supervisor with three-and-a-half months' experience would trump the views of a "supervisor of record" with eight-and-a-half months' experience.  But, notwithstanding the logic of the USDA's position, the Court cannot conclude *as a matter of law* that Fields knew that Chott's rating controlled.  To the contrary, she has submitted a declaration under the penalty of perjury stating that she did not learn until March 31, 2010, that she had received a "Superior" rating for the overall performance appraisal period.  Dkt. 39-1 at 5 (Fields Decl. ¶ 17).  This testimony is bolstered, moreover, by the fact that the second "Performance Appraisal" form does not specify the period of the evaluation and the fact that, immediately following her meeting with Chott on March 31, 2010, at which she says he first informed her that her overall rating was at the "Superior" level, Fields initiated the EEO counseling process.

Whether Fields reasonably *should* have known this in November 2009, *see* 29 C.F.R. § 1614.105(a)(2), presents a closer question.  Again, however, the Court concludes that the

11

relevant question turns on facts that are either disputed or not yet adequately developed. Most significantly, Fields attests that her (mis)understanding was based, at least in part, on discussions with Crisp, who was "a USDA human resources specialist." Dkt. 39-1 at 4 (Fields Decl. ¶ 15). Critically, the record does not reflect when, and in what context, that conversation occurred. If it occurred more than 45 days after Fields received her evaluation from Chotts, for example, it would carry little weight. But, if it occurred around the time she received the "Superior" rating, the Court would then need to consider whether Crisp spoke to Fields in an official capacity, what he said, and the basis for his opinion. Yet, none of that information is in the present record. Nor does the record reflect what, if anything, Chott said to Fields when she received her appraisal and what, if anything, Fields said to Chott. These questions are not exhaustive, but merely illustrate that the current dispute turns on facts that are not currently adequately developed.

The Court, accordingly, will deny the USDA's motion to dismiss or, in the alternative, for summary judgment, on exhaustion grounds and will grant Fields's motion for leave to take discovery relating to this issue.

## B.      2009 Performance Appraisal

The USDA also seeks summary judgment on the ground that it has articulated a legitimate, non-discriminatory reason why Fields received a "Superior" rating for 2009 and that Fields "can point to no evidence that this rating was the product of discrimination or retaliation." Dkt. 26 at 26–27. In support of this contention, the USDA submits a declaration from Chott, signed under the penalty of perjury, asserting that Fields was his "weakest employee, and each year [he would] give her the benefit of the doubt by raising what should [have been] a [']fully successful['] level to the next level, superior." Dkt. 26-1 at 6. In response, Fields argues that a reasonable jury might infer a discriminatory or retaliatory motive from the facts "that she was the

only detailed employee that had his/her rating of record lowered" and that, in doing so, Chott departed from USDA "policies and practices." Dkt. 30 at 27. And, even if this is not enough to establish a genuine dispute of material fact, Chott argues that summary judgment is premature because she had not yet had an opportunity to conduct relevant discovery. Dkt. 31. Among other things, she requests the opportunity to review her personnel file and documents that relate to how Chott evaluated other employees while they were on detail, Chott's assessment that "Fields 'is one of his weakest employees,'" communications relating to Fields's performance appraisals, and USDA policies and procedures regarding the evaluation of employees while on detail. Dkt. 39-2 (Fields 56(d) Decl.).

Because the USDA has proffered a legitimate, non-discriminatory reason for Fields's 2009 performance appraisal rating, the burden has shifted to Fields to "produce[] sufficient evidence for a reasonable jury to find that [the USDA's] asserted non-discriminatory reason was not the actual reason and that the [USDA] intentionally discriminated against" Fields due to her race or sex or in retaliation for her prior, protected EEO activity. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). On the present record, moreover, it is far from clear that Fields has carried this burden. The Court, however, need not decide that question. Rather, the Court agrees that summary judgment is premature before Fields has had "a full opportunity to conduct discovery" relating to this claim. *Liberty Lobby*, 477 U.S. at 257. As the D.C. Circuit has observed, Rule 56(d) motions "should be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery.'" *Convertino*, 684 F.3d at 99 (quoting *Berkeley*, 68 F.3d at 1414). Here, there is no evidence of a lack of diligence, and Fields has complied with the "letter" and "spirit" of Rule 56(d) by submitting a detailed declaration outlining the specific discovery she seeks. *See Resolution Trust Corp. v. N. Bridge Assocs.*, 22

F.3d 1198, 1203 (1st Cir. 1994); *Convertino*, 684 F.3d at 99 (citing *N. Bridge Assocs.*).  Because

that discovery may bear on the merits of Fields's claim regarding her 2009 performance

appraisal rating, the Court will deny the USDA's motion for summary judgment to the extent it

asserts a legitimate, non-discriminatory (and non-retaliatory) rationale for the rating, and will

grant Fields's Rule 56(d) motion seeking the opportunity to conduct relevant discovery.

**C.**     **2010 Performance Plan and Office Assignment**

The complaint also alleges that Chott attempted to "coerce" Fields into signing a

performance plan for 2010 during the heated meeting that occurred on March 31, 2010.  Compl.

¶ 41.  According to Fields, she tried to explain to Chott that she had already signed a

performance plan relating to her detail assignment, but Chott "became very belligerent and

insisted that he was correct and . . . that [Fields] did not have [an existing] performance plan."

*Id.* ¶ 42.  Although the complaint is silent as to the outcome of the meeting, both parties agree

that Fields did not sign the plan.  Dkt. 26 at 5 (Def.'s SUMF ¶ 12); Dkt. 30-1 at 7 (Pl.'s SUMF

¶ 18).  Moreover, Fields does not allege that the second performance plan was ever put into

effect, and the USDA confirms (with no objection from Fields) that the second plan "was never

put into effect because [Fields] remained on detail during that time period."  Dkt. 26 at 5 (Def.'s

SUMF ¶ 12). To the extent Fields's claims rely on this episode, the USDA moves to dismiss

because she could not have suffered any harm as a result of a performance plan that was never

signed and that never took effect.  In this section, the Court will address the USDA's argument

as it relates to Fields's disparate treatment and retaliation claims; it will then return briefly to the

issue in the following section, which addresses Fields's hostile work environment claim.

To establish a prima facie case of disparate treatment under Title VII, a plaintiff must

show that "(1) he is a member of a protected class, (2) he suffered an adverse employment

action, and (3) the unfavorable action gives rise to an inference of discrimination." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002).  An adverse employment action is a "diminution in pay or benefits" or "some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999).  The question is not whether an employer has taken an action that makes "an employee unhappy," *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001), but whether the action resulted in a "significant" and "objectively tangible" harm, *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009).

A prima facie case of retaliation also requires the plaintiff to show that she suffered an adverse employment action.  In retaliation cases, however, "the adverse action concept has a broader meaning" than in discrimination cases.  *Baird v. Gotbaum*, 662 F.3d 1246, 1249 (D.C. Cir. 2011) (internal quotation marks omitted).  "[A]ctions giving rise to [retaliation] claims are 'not limited to discriminatory actions that affect the terms and conditions of employment,' but reach any harm that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)).

Here, Fields fails to identify any effect that Chott's alleged insistence that she sign a second 2010 performance plan had on the terms or conditions of her employment.  And, although the standard for finding an "adverse action" in the context of a retaliation claim is more forgiving, Fields fails to offer any explanation for how she suffered any tangible consequence as a result of a performance plan that never took effect.  In short, it is difficult to fathom how a performance plan that was never implemented could have constituted "a significant change in

employment status," *Douglas*, 559 F.3d at 552, or could have dissuaded a reasonable person from making or supporting a claim of discrimination, *Burlington,* 548 U.S. at 64.  The Court, accordingly, concludes that Chott's alleged insistence that Fields sign a performance plan that she, in fact, did not sign and that, in fact, was never implemented does not constitute an "adverse action" sufficient to support a claim of disparate treatment or retaliation.

For similar reasons, the Court concludes that Fields's contention that Chott "demanded that [she] relinquish her DAFO/FSA office space because she was on detail in another building," Dkt. 30-1 at 4 (Plt's SDMF ¶ 9), even if included in her complaint, would not adequately allege "adverse action" for purposes of a disparate treatment or retaliation claim.  As Fields concedes, after she requested that Chott "place his demand in writing, he rescinded [the] demand." *Id.* Although a change in work space might in extraordinary circumstances rise to the level of "adverse action," *Prince v. Rice*, 453 F. Supp. 2d 14, 29 (D.D.C. 2006), mere consideration of a change—which never occurred—cannot satisfy any plausible conception of "adverse action."

Thus, to the extent Fields's claims rely on the 2010 performance plan or Chott's purported threat to require that Fields give up her DAFO office while on detail, they fail to state a claim and will be dismissed.

## D.     Hostile Work Environment

Fields further alleges that she was subjected to a hostile work environment because of her sex and race and in retaliation for her previous EEO activity.  *See* Compl. ¶¶ 57–59.  In her opposition brief, she identifies four incidents that she contends support this claim:  Chott lowered her performance rating in 2008; "he tried to evict [her] from her office space" in June 2009; he lowered her "rating of record" without telling her in November 2009; and he "tried to intimidate [her] into signing a performance plan" at a meeting on March 31, 2010, and then, at the

conclusion of that meeting, he slammed the door to his office so hard that the walls of the office shook. Dkt. 30 at 30-31. The USDA has moved to dismiss this claim, arguing that the incidents on which Fields bases her claim "amount to no more than the ordinary trials and tribulations of the workplace, in which an employee disagrees with actions taken by a supervisor in the exercise of her discretion to manage the office and the workload." Dkt. 26 at 31.

A plaintiff asserting a claim based on a hostile work environment faces a high hurdle. She "must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). This is not a "mathematically precise test." *Harris*, 510 U.S. at 22. Courts consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. The standard is meant to be "demanding" enough "to ensure that Title VII does not become a general civility code" or create liability for "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). It is not enough, moreover, that the plaintiff found the environment "subjectively offensive"—the environment must also have been "objectively . . . offensive." *Id.* at 787.

A hostile work environment can also support a claim of retaliation under Title VII. *See Baird*, 662 F.3d at 1250. It is unclear, however, whether the same standard applies to both discriminatory and retaliatory hostile work environment claims. *See Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 79 (D.D.C. 2013). As Judge Lamberth has explained at length, the standard

governing hostile work environment claims was developed prior to the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006). *See Bergbauer*, 934 F. Supp. 2d at 79–80. That standard was premised on the notion that "Title VII is not limited to 'economic' or 'tangible' discrimination," but, by the express terms of 42 U.S.C. § 2000e-2, extends to the "terms, conditions, or privileges of employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). From this language, the Supreme Court derived the requirement that a hostile work environment claim must "alter the conditions of the victim's employment." *Harris,* 510 U.S. at 21. In *Burlington Northern*, however, the Court interpreted a different provision of Title VII, the antiretaliation provision found in § 2000e-3(a), and concluded that "Title VII's substantive provision and its antiretaliation provision are not coterminous." 548 U.S. at 61–62, 67. As the Court explained, § 2000e-3(a) does not include the requirement, found in § 2000e-2, that the discriminatory conduct affect the "terms, conditions, or privileges of employment," but, rather, merely prohibits discrimination "against an employee because he has" engaged in protected EEO activity. *Id.* Based on this difference in text, the Supreme Court concluded that an "adverse action" occurs in the retaliation context when the employer's action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

This history, as Judge Lamberth has further explained, has convinced "at least three Circuits" to adopt "a standard more consistent with *Burlington Northern* in retaliatory hostile work environment cases." *Bergbauer*, 934 F. Supp. 2d at 81 (citing *Alvarado v. Donahoe*, 687 F.3d 453, 461 (1st Cir. 2012); *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042 (8th Cir. 2007); *Moore v. City of Phila.*, 401 F.3d 331, 346 (3d Cir. 2006)). The First Circuit has held, for

example, that to state a claim for retaliatory hostile work environment, a plaintiff need only

allege that the hostile work environment "well might have dissuaded a reasonable worker from

making or supporting a charge of discrimination." *Alvarado*, 687 F.3d at 461.  It is far from

clear, however, that the standard articulated by the First Circuit applies in this Circuit.  Rather,

shortly before the Supreme Court decided *Burlington Northern*, the D.C. Circuit held that to

prevail on a claim for a retaliatory hostile work environment, the plaintiff would need to show

that he was subject "to 'discriminatory intimidation, ridicule, and insult' of such sever[ity] or

pervasive[ness] [as] to *alter the conditions* of [his] employment and create an abusive working

environment.'"  *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006) (alterations in

original) (emphasis added) (quoting *Harris*, 510 U.S. at 21–22).  And the Court of Appeals

reaffirmed this conclusion, albeit in *dicta*, in 2011—five years after *Burlington Northern* was

decided.  *See Baird*, 662 F.3d at 1250.

Ultimately, not a great deal may turn on whether the *Burlington Northern* standard

applies in retaliatory hostile work environment cases because, even in those circuits that have

taken this approach, the plaintiff must still allege adverse action that is "severe or pervasive."

*Alvarado*, 687 F.3d at 461; *Moore*, 461 F.3d at 341.  That is, the environment must be

objectively "hostile," and not merely subject to the types of inconveniences, annoyances, and

interpersonal disagreements that are common in the workplace.  *Alvarado*, 687 F.3d at 461.  In

most cases, this requires a course of conduct—as distinct from a discrete act—often "occur[ring]

over a series of days or perhaps years."  *Nat't R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,

115 (2002).  Here, regardless of whether and how Burlington Northern may apply to retaliatory

hostile work environment claims, these requirements foreclose Fields's claim.

The majority of the incidents on which she relies involve nothing more than the type of "ordinary . . . vicissitudes of the workplace" that do no amount to actionable harassment. *Alvarado*, 687 F.3d at 461.  She contends, for example, that Chott "intimidat[ed]" her by "trying to have surrender her DAFO/FSA work station," and by attempting to convince her to sign a second 2010 performance plan.  Dkt. 30 at 21.  But, even if moving an employee out of her work station while she was on detail elsewhere in the agency, or requiring that an employee sign a second performance plan, might rise to the level of harassment—a proposition the Court doubts—on both occasions Chott declined to follow through.  Fields was allowed to keep her DAFO office space while on detail, and she did not sign the second performance plan.

Fields's complaint about the slammed door that followed her March 2010 meeting with Chott presents a slightly closer call.  Through one lens, it is possible that this incident was the most trivial of all those in the complaint, the exact sort of violation of a "general civility code" into which courts do not wade.  *Faragher*, 524 U.S. at 788.  On the other hand, the complaint says that Chott slammed the door so hard that it "shook the walls of the office," spurred a secretary to ask whether she should call for security, and caused a superior to leave his office to see if everything was okay.  Compl. ¶¶ 36–38.  It also says that Fields felt "intimidated, frightened, and upset" by the incident.  *Id.* ¶ 39.  In the end, however, the Court concludes that this isolated display of frustration or anger is insufficient to state claim for a hostile work environment.

To be sure, courts have on rare occasion found that a single, isolated incident can alone create a hostile work environment.  Cases of that sort, however, tend to involve acts of serious, physical violence or sexual assault.  *See, e.g.*, *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1242–43 (10th Cir. 2001) (involving a plaintiff who was violently sexually assaulted); *Smith v.*

*Sheahan*, 189 F.3d 529, 531 (7th Cir. 1999) (involving a plaintiff who was violently assaulted to the point that her injury required surgery).  But, absent such "extreme circumstances, courts have refused to hold that one incident is so severe as to constitute a hostile work environment.  Even a few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002); *see also Faragher*, 524 U.S. at 788 ("[I]solated incidents (unless extremely serious) will not amount to" a hostile work environment).  A slammed door, even following an angry conversation, falls in a very different category than physical and sexual assaults.  And, despite the long and difficult relationship between Fields and Chott, the complaint does not allege any other incident between the two that even hinted at acts of physical intimidation or violence.  In short, even assuming that Chott "screamed" at Fields and forcefully slammed the door to his office, that episode—although regrettable—was neither "severe" nor "pervasive."  *See George v. Leavitt*, 407 F.3d 405, 408, 416 (D.C. Cir. 2005) (claim that coworkers "shouted" at plaintiff on multiple occasions and told her to "shut up" insufficient to state a claim); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 54 (D.D.C. 2004) (claim that supervisor told plaintiff "to shut up and sit down" and "scream[ed]" at her insufficient to state a claim).

This then leaves Fields's claims that Chott impermissibly lowered her performance evaluation in November 2009 and filled the vacant GS-14 position in March 2011 without providing Fields an opportunity to compete for the position.  Dkt. 30 at 21.  Merely alleging one disappointing performance evaluation and one missed opportunity to seek a promotion over the course of sixteen months, however, is insufficient to establish that Fields's workplace was "permeated with 'discriminatory intimidation, ridicule, and insult.'"  *Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank, FSB*, 477 U.S. at 65).  In this respect, Fields "misunderstands the

nature of a hostile work environment claim." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 774 F. Supp. 2d 76, 110 (D.D.C. 2011). "Cobbling together a number of distinct, disparate acts will not create a hostile work environment, because '[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim." *Id.* (alterations in original) (quoting *Franklin v. Potter*, 600 F. Supp. 2d 38, 77 (D.D.C. 2009)). This is particularly true where the plaintiff's allegations are based on "work-related actions by supervisors" acting within the scope of their official duties. *Id.* at 110–11. Indeed, to hold to the contrary would transform virtually every discrimination or retaliation case involving more than one challenged action into a hostile work environment case.

The Court will, accordingly, grant the USAD's motion to dismiss Fields's hostile work environment claim.

**E.      Failure to Promote**

Finally, Fields alleges that the USDA engaged in unlawful discrimination and retaliation when Chott transferred Boyd into Nagel's GS-14 position without providing Fields (and presumably others) with an opportunity to compete for that position. *See* Compl. ¶¶ 57–59. The USDA argues that it is entitled to summary judgment on this claim because Chott had legitimate, nondiscriminatory reasons for reassigning Boyd to replace Nagel: Boyd had worked closely with both Nagel and Chott for more than a decade, completing many of the tasks that Nagel's position required, and Chott was worried that a potential hiring freeze would prevent him from filling the position if he announced an open vacancy. *See* Dkt. 26 at 34–35.

This argument relies on material outside the four corners of complaint and turns in substantial part on Chott's declaration regarding his motivations. Dkt. 26-9 (Chott Decl.). He attests, for example, that Boyd worked closely with him and Nagel on "a range of issues

involving FSA state and county offices . . . , Hatch Act and Ethics issues, hiring and buyouts, office closures and consolidations, and employee associations." *Id.* at 2. To this he adds that Boyd "is recognized throughout the FSA organization as one of the most knowledgeable HR professionals," that she "is the key person in writing regulations, handbooks, and notices concerning state and county personnel matters," and that she was "a perfect fit to replace . . . Nagel." *Id.* And finally, Chott asserts that "in 2010, . . . Boyd approached [him] and expressed an interest in being reassigned to [his] office," and that he decided quickly to make the reassignment out of a concern that the FSA would face "a hiring freeze or restricted hiring policy" in the near future. *Id.* at 2–3.

Fields, however, has not yet had the opportunity to test this explanation by conducting discovery. As she explains in her Rule 56(d) declaration, if permitted to do so, she would like to take Chott's deposition and to obtain documentary evidence relating to the USDA's decision to reassign Boyd to Nagel's position and not to open the position for competition. Dkt. 39-2 at 3, 5. Under the prevailing rule in this Circuit, consideration of the USDA's motion for summary judgment is premature until she has had a "full opportunity to conduct" this discovery. *Covertino*, 684 F.3d at 99; *see also Liberty Lobby*, 477 U.S. at 257. The Court will accordingly deny the USDA's motion as premature.

## CONCLUSION

For the reasons stated above, the USDA's motion to dismiss is **GRANTED** in part and **DENIED** in part. Its motion for summary judgment is **DENIED** without prejudice. Fields's motion for discovery is **GRANTED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 16, 2016